IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARGO DAVIS,<br><br>Plaintiff,<br><br>v.<br><br>INTUITIVE SURGICAL, INC. and INTUITIVE SURGICAL OPERATIONS, INC.,<br><br>Defendants. | Civil Action No.<br><br>JURY TRIAL DEMANDED |

**<u>COMPLAINT</u>**

COMES NOW, Margo Davis ("Plaintiff" or "Ms. Davis"), by and through her undersigned counsel, and files this, her Complaint, and shows the Court as follows:

**NATURE OF COMPLAINT**

**1.** Plaintiff brings this action for damages and reasonable attorney fees against Defendants Intuitive Surgical, Inc. and Intuitive Surgical Operations, Inc. (collectively "Defendants") for violations of her rights under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), including claims of race discrimination and retaliation; 42 U.S.C. § 1981 ("Section 1981"); the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"); and the Civil Rights Act of 1991.

## JURISDICTION AND VENUE

**2.** This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under federal law, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4), which provide for jurisdiction in actions to recover damages or to secure equitable relief under Acts of Congress providing for the protection of civil rights.

**3.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business in this judicial district, Plaintiff resides in this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district. The unlawful employment practices alleged herein were committed within this judicial district.

## ADMINISTRATIVE PROCEDURES

**4.** Plaintiff has fulfilled all conditions precedent necessary to proceed with this action. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Atlanta District Office, on July 15, 2025, Charge Number

410-2025-12089. The EEOC issued a Right-to-Sue Notice on January 5, 2026. This action is filed within ninety days of receipt thereof as required by 42 U.S.C. § 2000e-5(f)(1).

**PARTIES**

**5.** Plaintiff Margo Davis is an African American female, a citizen of the United States, and a resident of Smyrna, Georgia. Plaintiff is subject to the jurisdiction of this Court.

**6.** Defendant Intuitive Surgical, Inc. is a Delaware corporation with its principal place of business located at 1020 Kifer Road, Sunnyvale, California 94086. Defendant Intuitive Surgical, Inc. maintains a business office in Georgia located at 5655 Spalding Drive, Peachtree Corners, Georgia 30092, and is qualified and licensed to do business in Georgia. At all times material hereto, Defendant Intuitive Surgical, Inc. has conducted business within this District.

**7.** During all times relevant hereto, Defendant Intuitive Surgical, Inc. has been an employer engaged in an industry affecting commerce and has employed more than five hundred (500) employees for each working day in each of twenty or more calendar weeks in the current and preceding calendar years. Defendant Intuitive Surgical, Inc. is therefore an "employer" as defined under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e(b), and is subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

**8.** Defendant Intuitive Surgical Operations, Inc. is a Delaware corporation with its principal place of business located at 1020 Kifer Road, Sunnyvale, California 94086. Defendant Intuitive Surgical Operations, Inc. maintains a business office in Georgia located at 5655 Spalding Drive, Peachtree Corners, Georgia 30092, and is qualified and licensed to do business in Georgia. At all times material hereto, Defendant Intuitive Surgical Operations, Inc. has conducted business within this District.

**9.** During all times relevant hereto, Defendant Intuitive Surgical Operations, Inc. has been an employer engaged in an industry affecting commerce and has employed more than five hundred (500) employees for each working day in each of twenty or more calendar weeks in the current and preceding calendar years. Defendant Intuitive Surgical Operations, Inc. is therefore an "employer" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), and is subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

**10.** Defendants Intuitive Surgical, Inc. and Intuitive Surgical Operations, Inc. are related corporate entities that share common ownership, officers, and human resources functions, and jointly employed Plaintiff during all times relevant to this action.

**11.** Defendant Intuitive Surgical, Inc. may be served with process by delivering a copy of the summons and complaint to its Registered Agent, CT Corporation System, located at 289 S Culver Street, Lawrenceville, Georgia 30046-4805.

**12.** Defendant Intuitive Surgical Operations, Inc. may be served with process by delivering a copy of the summons and complaint to its Registered Agent, CT Corporation System, located at 289 S Culver Street, Lawrenceville, Georgia 30046-4805.

## FACTUAL ALLEGATIONS

### Employment Background

**13.** Plaintiff was hired by Defendants on September 26, 2022, as Vice President, HR - Corporate Functions.

**14.** Plaintiff's initial supervisor was Michele DiMartino, who served as Defendants' Chief Human Resources Officer.

**15.** Plaintiff's initial compensation package included an annual base salary of $330,000, a target bonus of 50% of base salary, a $55,000 signing bonus, and an equity grant with a total value of $1,200,000, consisting of 75% in restricted stock units and 25% in stock options, vesting over four years.

**16.** By 2025, Plaintiff's annual salary had increased to $356,135.78, with a target bonus of 50% totaling $178,067.89. Plaintiff also received an Equity Award valued

at $472,500 in 2025 that was scheduled to vest over a four-year period. Upon information and belief, this substantial Equity Award was granted to recognize Plaintiff's excellent performance and extraordinary contributions.

**17.** Plaintiff worked remotely from Georgia while Defendants' headquarters were located in California, with Defendants maintaining a Georgia office in Peachtree Corners.

**18.** As Vice President, HR - Corporate Functions, Plaintiff was responsible for overseeing human resources business partner functions, managing HR staff, supporting organizational strategy, and partnering with senior executives across Defendants' organization.

**19.** During her initial period of employment, Plaintiff received positive feedback and successfully performed her duties.

**20.** Plaintiff was given increased managerial and supervisory responsibility during her tenure and received multiple salary increases based on her performance and contributions to Defendants' organization.

**Performance Issues and Racial Stereotyping**

**21.** Michele DiMartino left Defendants' employment on June 30, 2023.

**22.** Following DiMartino's departure, Plaintiff reported to Christina Brzica, a white female who served as Acting People Officer for People Strategy & Consulting for approximately 18 months.

**23.** During the approximately 18 months that Plaintiff reported to Brzica, Brzica excluded Plaintiff from meetings necessary for Plaintiff to complete her assigned deliverables and withheld information crucial for Plaintiff to complete important projects.

**24.** Brzica misrepresented Plaintiff's work as her own on multiple occasions, including during a business meeting in Korea where Brzica presented slides to the HR team that included Plaintiff's work without Plaintiff's knowledge or consent.

**25.** Brzica also represented Plaintiff's work as her own during a presentation with HR business partners, removing Plaintiff's title from slides and proceeding to present Plaintiff's work as her own.

**26.** Brzica failed to acknowledge Plaintiff's contributions and attempted to remove resources from Plaintiff's team, which would have jeopardized the business.

**27.** Plaintiff reported these instances to Gary Guthart, the Chief Executive Officer.

**28.** During meetings with the CEO, Brzica acknowledged that she had misrepresented Plaintiff's work as her own.

**29.** Brzica explained she was doing this to ensure that once Defendants had a new CHRO, Plaintiff would report to her rather than to the CHRO.

**30.** The CEO noted he would reprimand Brzica for these actions.

**31.** On March 3, 2025, Christina Brzica was terminated from her employment with Defendants.

**32.** In October 2024, Plaintiff's reporting structure changed, and she began reporting to Pat Wadors, who had been hired as Chief Human Resources Officer.

**33.** During her 2024 performance review, Plaintiff received criticism regarding "episodic" engagement, trust issues, emotional reactions, follow-through concerns, and communication style.

**34.** Specifically, the 2024 performance review stated that Plaintiff exhibited "self preserving" behaviors that were not aligned to the culture when anxious and not at her best self.

**35.** The review criticized Plaintiff for not being able to engage objectively as a "dance partner" to her supervisor or peers.

**36.** The review stated that Plaintiff should adjust the tone of her questioning and the courage of her convictions, noting that feedback suggested Plaintiff could feel "more rigid or aggressive than assertive."

**37.** The review criticized Plaintiff for creating anxiety rather than "stabilization" through transparency, stating Plaintiff shared more than should be shared, putting peers and employees on a "roller coaster ride."

**38.** These characterizations perpetuated harmful racial stereotypes about African American women as being "emotional," having "trust issues," or having problematic communication styles.

**39.** Despite Plaintiff's consistent performance and demonstrated success in her role, she was subjected to heightened scrutiny and criticism that was not applied to similarly situated employees outside her protected class.

**40.** Upon information and belief, Wadors openly disparaged Plaintiff to other white members of the Human Resources Leadership Team, damaging Plaintiff's reputation internally. Similarly situated white employees in executive positions were not subjected to the same level of criticism or characterizations about their communication styles or emotional responses.

**Protected Activity and Internal Complaints**

**41.** Under the recommendation of CEO Gary Guthart, Plaintiff began meeting with Gary Loeb, Defendants' Chief Legal and Compliance Officer, on April 3, 2025, regarding Plaintiff's treatment concerns from Pat Wadors.

**42.** Plaintiff continued to meet with Gary Loeb monthly to report her concerns about discriminatory treatment.

**43.** During these meetings, Plaintiff raised specific concerns about how she was being treated differently from other executives and about statements that perpetuated racial stereotypes.

**44.** Plaintiff opposed what she reasonably believed to be discriminatory practices based on her race as an African American woman.

**45.** On June 6, 2025, Pat Wadors presented Plaintiff with three options via email regarding her continued employment, which Plaintiff understood constituted adverse employment actions.

**46.** Following the presentation of these adverse options, Plaintiff raised her concerns in a meeting with Katrina Thomas-Dycus, Associate General Counsel, on June 13, 2025.

**47.** During this meeting, Plaintiff specifically complained that the adverse employment options presented to her constituted discriminatory treatment based on her race.

**48.** On June 17, 2025, Plaintiff made an additional complaint to Katrina Thomas-Dycus about the discriminatory treatment she was experiencing.

**49.** Katrina Thomas-Dycus indicated she was investigating Plaintiff's concerns.

**50.** On June 24, 2025, Gary Loeb canceled the scheduled monthly meeting with Plaintiff.

**51.** The cancellation occurred shortly after Plaintiff's complaints to the Associate General Counsel.

**52.** Following Plaintiff's complaints, Katrina Thomas-Dycus shifted Defendants' position regarding the adverse employment options that had been presented to Plaintiff.

**53.** Despite the fact that Company policy required every employee to have an active job description on file, Katrina Thomas-Dycus stated that Pat Wadors felt "pressured" because Plaintiff kept asking about her role and what her new position would be, since everything Plaintiff had been doing was transferred to a new white female employee.

**54.** Katrina Thomas-Dycus stated that Defendants offered Plaintiff the options because they had not yet figured out a role for Plaintiff.

**Adverse Employment Actions**

**55.** On June 6, 2025, Pat Wadors sent Plaintiff an email forcing Plaintiff to choose between three adverse employment options.

**56.** Option 1 required Plaintiff to accept a demotion to "Interim VP, Org Effectiveness" role with a guaranteed termination on December 1, 2025, with her last physical day in the office being October 31, 2025.

**57.** Under Option 1, Plaintiff would be offered only 12 weeks of severance and 12 weeks of COBRA at the time of her December 1, 2025 termination, along with her full year 2025 bonus and six months of outplacement assistance.

**58.** Option 2 required Plaintiff to accept a demotion to Senior Director HRBL with forced relocation to Sunnyvale, California.

**59.** The Senior Director HRBL position was a step down in title and required Plaintiff to relocate from Georgia to California.

**60.** Option 3 offered an early exit with reduced severance if Plaintiff left before September 1, 2025.

**61.** Under Option 3, if Plaintiff exited before September 1, 2025, Defendants would adjust the severance to be in alignment with their "normal role elimination package."

**62.** Initially, the options presented to Plaintiff had specific dates and deadlines for Plaintiff's response.

**63.** Pat Wadors' June 6, 2025 email suggested aligning on a decision "within the next week or two."

**64.** However, after Plaintiff's complaints to the Associate General Counsel, Katrina Thomas-Dycus indicated that these were "just options" and that Defendants were not forcing Plaintiff to leave.

**65.** This shifting characterization of the options occurred after Plaintiff engaged in protected activity by complaining about discriminatory treatment.

**66.** All three options presented to Plaintiff constituted materially adverse employment actions that would deter a reasonable employee from opposing discriminatory practices.

**67.** On August 15, 2025, Defendants placed Plaintiff on paid administrative leave effective immediately.

**68.** The placement on administrative leave occurred approximately two months after Plaintiff's internal complaints of discrimination and retaliation.

**69.** Defendants' August 15, 2025 letter stated they were proceeding with Option 1, Interim VP, Organizational Effectiveness, with Plaintiff's last day of employment being December 1, 2025.

**70.** Defendants' letter confirmed that Plaintiff would remain on paid leave until December 1, 2025.

**71.** Plaintiff's employment was terminated effective December 1, 2025.

## ERISA Severance Plan Violations

**72.** Defendants maintain a standard ERISA severance policy applicable to employees at different levels within the organization.

**73.** Under Defendants' U.S. ISI Severance Policy - Non-Commissioned, Vice Presidents are entitled to a base severance of 26 weeks of salary for the first year of service.

**74.** Vice Presidents are entitled to an additional 2 weeks of severance for each subsequent year of service.

**75.** The maximum severance cap for Vice Presidents under the ERISA plan is 52 weeks.

**76.** For Plaintiff's approximately three years of service (from September 26, 2022 to December 1, 2025), Plaintiff was entitled to approximately 32 weeks of severance under the ERISA plan (26 weeks base plus 2 weeks for each of approximately 3 years of service).

**77.** Defendants offered Plaintiff only 12 weeks of severance, significantly less than the 32 weeks to which she was entitled under the ERISA severance plan.

**78.** The severance offer of $84,515 included only 12 weeks of severance pay plus 3 months of COBRA premium payments totaling $2,329.80.

**79.** Under the ERISA plan, Plaintiff should have received COBRA payments matching the total weeks of severance, not just 3 months.

**80.** Under the ERISA plan, Vice Presidents are entitled to 12 months of outplacement services, but Defendants offered Plaintiff only 6 months.

**81.** Defendants failed to follow their own ERISA severance plan terms when calculating and offering severance to Plaintiff.

**82.** Similarly situated Vice Presidents who were not African American were provided severance in accordance with the ERISA plan terms.

**83.** The differential treatment in applying the ERISA severance plan constitutes discrimination based on Plaintiff's race.

**84.** Defendants' failure to apply their ERISA plan consistently to Plaintiff demonstrates racially discriminatory application of benefit plans.

**85.** The separation agreement offered to Plaintiff required her to release all claims of discrimination, harassment, and retaliation in exchange for the inadequate severance payment.

**86.** The separation agreement contained broad release language covering Title VII claims, ADA claims, ADEA claims, and state law claims.

## Temporal Proximity and Causal Connection

**87.** The adverse employment actions occurred in close temporal proximity to Plaintiff's protected activity.

**88.** Plaintiff began reporting concerns about discriminatory treatment to Gary Loeb in April 2025.

**89.** Within two months of initiating these monthly meetings, on June 6, 2025, Plaintiff was presented with three adverse employment options.

**90.** Within one week of Plaintiff's June 13, 2025 and June 17, 2025 complaints to the Associate General Counsel, Gary Loeb canceled the scheduled meeting with Plaintiff on June 24, 2025.

**91.** Within approximately two months of Plaintiff's internal complaints, on August 15, 2025, Defendants placed Plaintiff on administrative leave.

**92.** The temporal proximity between Plaintiff's protected activity and the adverse actions establishes a causal connection.

**93.** Defendants' shifting explanations for the adverse employment options further demonstrate that the stated reasons were pretextual and that the true reason was retaliation for Plaintiff's complaints.

**94.** Defendants initially characterized the options as having specific deadlines, but later characterized them as "just options" after Plaintiff complained, demonstrating inconsistent and shifting justifications.

**Damages and Economic Harm**

**95.** As a direct result of Defendants' discriminatory and retaliatory conduct, Plaintiff has suffered significant economic damages.

**96.** Plaintiff lost salary totaling $356,135.78 annually.

**97.** Plaintiff lost bonus compensation totaling $178,067.89 annually.

**98.** Plaintiff lost unvested equity with substantial value that was scheduled to vest over multiple years.

**99.** Specifically, Plaintiff lost stock options and restricted stock units scheduled to vest on November 1, 2025, with an approximate value of $1,000,000.

**100.** Plaintiff lost additional equity scheduled to vest in 2026 with a value of approximately $1,134,591.21.

**101.** Plaintiff lost additional equity scheduled to vest in 2027 with a value of approximately $369,978.37.

**102.** Plaintiff lost additional equity scheduled to vest in 2028 with a value of approximately $310,951.53.

**103.** Plaintiff lost additional equity scheduled to vest in 2029 with a value of approximately $102,230.64.

**104.** The total unvested equity that Plaintiff lost as a result of her termination exceeds $1,900,000.

**105.** The equity grant was provided to Plaintiff in part to replace ownership she gave up from her previous employer when she joined Defendants.

**106.** Plaintiff has suffered severe emotional distress as a result of Defendants' discriminatory and retaliatory conduct.

**107.** Plaintiff has required and continues to require medical treatment for the emotional distress, including treatment from a therapist and a psychiatrist.

**108.** Plaintiff has incurred medical expenses for this treatment.

**109.** Plaintiff continues to suffer ongoing emotional distress related to the discriminatory treatment and wrongful termination.

**Pretext and Disparate Treatment**

**110.** Defendants' stated reasons for the adverse employment actions are pretextual.

**111.** Similarly situated employees outside Plaintiff's protected class, particularly white executives, were not subjected to the same adverse options or treatment.

**112.** Similarly situated Vice Presidents who were not African American were not forced to choose between demotion, relocation, or termination with reduced severance.

**113.** Similarly situated Vice Presidents who were not African American received severance in accordance with the ERISA plan terms.

**114.** The criticism of Plaintiff's communication style and characterization of her as having "emotional reactions" and "trust issues" was not applied to similarly situated white executives.

**115.** The true reason for Defendants' adverse treatment of Plaintiff was her race as an African American woman.

**116.** The true reason for the adverse employment actions was retaliation for Plaintiff's opposition to discriminatory practices and her complaints of race discrimination.

**117.** Defendants' failure to apply their ERISA severance plan consistently to Plaintiff demonstrates both racial discrimination and pretextual justifications for differential treatment.

## CLAIMS FOR RELIEF

## COUNT I: RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

**118.** Plaintiff re-alleges paragraphs 1 through 117 as if fully set forth herein.

**119.** Plaintiff is an African American woman and a member of a protected class under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

**120.** Plaintiff was qualified for her position as Vice President, HR - Corporate Functions, and successfully performed the duties of her position throughout her employment.

**121.** Defendants subjected Plaintiff to adverse employment actions, including but not limited to: presenting her with three adverse employment options involving demotion, forced relocation, or termination; placing her on administrative leave; and ultimately terminating her employment.

**122.** These adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's race.

**123.** Defendants' criticism of Plaintiff's communication style, characterization of her as having "emotional reactions," "trust issues," and being "rigid or aggressive," perpetuated harmful racial stereotypes about African American women.

**124.** Similarly situated employees outside Plaintiff's protected class, particularly white executives, were not subjected to the same level of scrutiny, criticism, or characterizations about their communication styles or emotional responses.

**125.** Similarly situated Vice Presidents who were not African American were not forced to choose between demotion, relocation, or termination with reduced severance.

**126.** Plaintiff's race was a motivating factor in Defendants' decision to subject her to adverse employment actions and ultimately terminate her employment.

**127.** As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered economic damages, including lost wages, lost bonuses, lost equity compensation, and lost benefits, as well as non-pecuniary damages including severe emotional distress.

**128.** Defendants' actions were undertaken with malice or reckless indifference to Plaintiff's federally protected rights, thereby entitling Plaintiff to punitive damages pursuant to the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

**129.** Defendants are therefore liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1981a(a)(1).

## COUNT II: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

**130.** Plaintiff re-alleges paragraphs 1 through 129 as if fully set forth herein.

**131.** Plaintiff engaged in protected activity under Title VII, 42 U.S.C. § 2000e-3(a), by complaining of race discrimination beginning in April 2025 and continuing through June 2025.

**132.** Specifically, Plaintiff complained to Gary Loeb, Defendants' Chief Legal and Compliance Officer, during monthly meetings beginning April 3, 2025, regarding discriminatory treatment from Pat Wadors.

**133.** Plaintiff further complained to Katrina Thomas-Dycus, Associate General Counsel, on June 13, 2025 and June 17, 2025, specifically stating that the adverse employment options presented to her constituted discriminatory treatment based on her race.

**134.** Following Plaintiff's protected activity, Defendants took materially adverse actions against her, including: canceling scheduled meetings with Gary Loeb; shifting the characterization and justification for the adverse employment options; placing her on administrative leave on August 15, 2025; and terminating her employment on December 1, 2025.

**135.** There is a causal connection between Plaintiff's protected activity and the adverse employment actions, as evidenced by the temporal proximity between her complaints and the adverse actions.

**136.** Within one week of Plaintiff's June 13 and June 17, 2025 complaints to the Associate General Counsel, Gary Loeb canceled the scheduled meeting with Plaintiff on June 24, 2025.

**137.** Within approximately two months of Plaintiff's internal complaints, Defendants placed Plaintiff on administrative leave.

**138.** Defendants' shifting justifications for the adverse employment options—initially presenting them with specific deadlines, then characterizing them as "just options" after Plaintiff complained—demonstrates that the reasons were pretextual and that the true reason was retaliation.

**139.** The adverse actions taken by Defendants would dissuade a reasonable employee from making or supporting a charge of discrimination.

**140.** As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered economic damages, including lost wages, lost bonuses, lost equity compensation, and lost benefits, as well as non-pecuniary damages including severe emotional distress.

**141.** Defendants' actions were undertaken with malice or reckless indifference to Plaintiff's federally protected rights, thereby entitling Plaintiff to punitive damages pursuant to the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

**142.** Defendants are therefore liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1981a(a)(1).

**COUNT III: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

**143.** Plaintiff re-alleges paragraphs 1 through 142 as if fully set forth herein.

**144.** Section 1981 of the Civil Rights Act, 42 U.S.C. § 1981, prohibits race discrimination in the making and enforcement of contracts, including employment contracts.

**145.** The term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

**146.** Plaintiff's employment with Defendants was a contractual relationship protected by Section 1981.

**147.** Defendants intentionally discriminated against Plaintiff based on her race as an African American woman in the terms and conditions of her employment.

**148.** Defendants' discrimination included subjecting Plaintiff to performance criticisms that perpetuated racial stereotypes, applying heightened scrutiny not

applied to similarly situated white employees, and transferring Plaintiff's work responsibilities to a white female employee.

**149.** Defendants intentionally discriminated against Plaintiff based on her race by presenting her with three adverse employment options involving demotion, forced relocation, or termination, while not subjecting similarly situated white executives to such options.

**150.** Defendants intentionally discriminated against Plaintiff based on her race by ultimately terminating her employment.

**151.** Defendants' discriminatory conduct interfered with Plaintiff's right to make and enforce her employment contract free from racial discrimination.

**152.** Defendants' discriminatory conduct deprived Plaintiff of the equal enjoyment of all benefits, privileges, terms, and conditions of her employment contract.

**153.** As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered economic damages, including lost wages, lost bonuses, lost equity compensation valued at over $1,900,000, and lost benefits, as well as non-pecuniary damages including severe emotional distress.

**154.** Defendants' actions were undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

**155.** Section 1981 allows for punitive damages without the statutory caps imposed by Title VII.

**156.** Defendants are therefore liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1981.

**COUNT IV: RETALIATION IN VIOLATION OF 42 U.S.C. § 1981**

**157.** Plaintiff re-alleges paragraphs 1 through 156 as if fully set forth herein.

**158.** Retaliation for opposing racial discrimination is actionable under Section 1981 as interference with contractual rights. CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008).

**159.** Plaintiff engaged in protected activity by opposing racial discrimination, including complaining to Gary Loeb beginning in April 2025 and complaining to Katrina Thomas-Dycus on June 13, 2025 and June 17, 2025.

**160.** Following Plaintiff's protected activity, Defendants took adverse actions against her, including: canceling scheduled meetings; placing her on administrative leave; and terminating her employment.

**161.** Defendants' retaliatory conduct interfered with Plaintiff's right to make and enforce her employment contract free from racial discrimination.

**162.** Defendants' retaliatory conduct deprived Plaintiff of the equal enjoyment of all benefits, privileges, terms, and conditions of her employment contract.

**163.** As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered economic damages, including lost wages, lost bonuses, lost equity compensation valued at over $1,900,000, and lost benefits, as well as non-pecuniary damages including severe emotional distress.

**164.** Defendants' actions were undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

**165.** Section 1981 allows for punitive damages without the statutory caps imposed by Title VII.

**166.** Defendants are therefore liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1981.

## COUNT V: DENIAL OF BENEFITS IN VIOLATION OF ERISA

**167.** Plaintiff re-alleges paragraphs 1 through 166 as if fully set forth herein.

**168.** Defendants maintain a standard ERISA-governed severance pay plan under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq.

**169.** Defendants' U.S. ISI Severance Policy - Non-Commissioned is an employee welfare benefit plan governed by ERISA.

**170.** Under the terms of the ERISA severance plan, Vice Presidents are entitled to a base severance of 26 weeks of salary for the first year of service.

**171.** Under the terms of the ERISA severance plan, Vice Presidents are entitled to an additional 2 weeks of severance for each subsequent year of service.

**172.** The maximum severance cap for Vice Presidents under the ERISA severance plan is 52 weeks.

**173.** Plaintiff was a participant in Defendants' ERISA severance plan by virtue of her employment as a Vice President.

**174.** Plaintiff was entitled to benefits under the terms of the ERISA severance plan based on her approximately three years of service from September 26, 2022 to December 1, 2025.

**175.** Specifically, Plaintiff was entitled to approximately 32 weeks of severance (26 weeks base plus 2 weeks for each of 3 years of service).

**176.** Under the ERISA severance plan, Plaintiff was entitled to COBRA payments matching the total weeks of severance, which would have been approximately 32 weeks.

**177.** Under the ERISA severance plan, Vice Presidents are entitled to 12 months of outplacement services.

**178.** Defendants denied Plaintiff benefits by offering her only 12 weeks of severance, significantly less than the 32 weeks to which she was entitled under the ERISA severance plan terms.

**179.** Defendants denied Plaintiff benefits by offering her only 3 months of COBRA premium payments totaling $2,329.80, significantly less than the approximately 32 weeks to which she was entitled under the ERISA severance plan terms.

**180.** Defendants denied Plaintiff benefits by offering her only 6 months of outplacement services, less than the 12 months to which she was entitled under the ERISA severance plan terms.

**181.** The total severance offer of $84,515 was substantially less than the benefits to which Plaintiff was entitled under the clear terms of Defendants' ERISA severance plan.

**182.** Defendants' denial of benefits to which Plaintiff was entitled under the plan terms constitutes a violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

**183.** Plaintiff is entitled to recover the full benefits due to her under the ERISA severance plan terms, specifically the difference between the 12 weeks offered and the 32 weeks due, plus corresponding COBRA payments and outplacement services.

**184.** Plaintiff is entitled to interest on the wrongfully denied benefits.

**185.** Plaintiff is entitled to costs and reasonable attorneys' fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

## COUNT VI: RACE DISCRIMINATION IN APPLICATION OF ERISA PLAN IN VIOLATION OF 42 U.S.C. § 1981

**186.** Plaintiff re-alleges paragraphs 1 through 185 as if fully set forth herein.

**187.** Defendants' failure to follow their ERISA severance plan terms for Plaintiff, while applying the plan properly to similarly situated Vice Presidents who are not African American, constitutes race discrimination in violation of 42 U.S.C. § 1981.

**188.** Defendants' discriminatory application of the ERISA severance plan interfered with Plaintiff's contractual rights under her employment contract.

**189.** Defendants' discriminatory application of the ERISA severance plan deprived Plaintiff of the equal right to make and enforce contracts, including the equal enjoyment of benefits under her employment contract.

**190.** Similarly situated Vice Presidents who were not African American received severance in accordance with the ERISA severance plan terms.

**191.** Defendants' failure to apply the ERISA severance plan consistently to Plaintiff was motivated by racial animus and discrimination based on Plaintiff's race as an African American woman.

**192.** This count provides an additional theory of recovery under Section 1981 based on the discriminatory application of the ERISA severance plan.

**193.** As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered economic damages in the form of denied severance benefits.

**194.** Defendants' actions were undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

**195.** Section 1981 allows for compensatory and punitive damages not available under ERISA itself.

**196.** Defendants are therefore liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Margo Davis respectfully prays for judgment against Defendants as follows:

(a) Back pay and front pay, including lost wages, bonuses, and benefits from June 6, 2025 through judgment and beyond, including lost equity and stock vesting valued at over $1 million in November 2025 and approximately $1.9 million in future vesting;

(b) Compensatory damages for emotional distress, mental anguish, pain and suffering, reputational harm, and other non-economic injuries;

(c) Punitive damages based on Defendants' willful, malicious, reckless, and intentional discrimination and retaliation under the Civil Rights Act of 1991 and 42 U.S.C. § 1981;

(d) The full amount of severance benefits due under Defendants' ERISA plan, approximately 32 weeks of severance, plus interest, pursuant to 29 U.S.C. § 1132(a)(1)(B) and (g);

(e) Reasonable attorney's fees, litigation expenses, and costs pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988, and 29 U.S.C. § 1132(g);

(f) Prejudgment and post-judgment interest at the maximum rate allowed by law;

(g) Declaratory relief establishing that Defendants violated Plaintiff's statutory rights;

(h) Injunctive relief including reinstatement or front pay in lieu thereof, and prohibiting Defendants from engaging in further discriminatory or retaliatory conduct;

(i) A trial by jury as to all issues so triable;

(j) All costs of this action; and

(k) Such other and further relief as this Court deems just, equitable, and proper.

Respectfully submitted this 26th day of March, 2026.

**BARRETT & FARAHANY**

s/ *Monica Garcia*
Monica Garcia
Georgia Bar No. 283744

*Counsel for Plaintiff Margo Davis*

2921 Piedmont Rd NE
Atlanta, Georgia 30305
(404) 214-0120
mgarcia@justiceatwork.com